**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

VICTOR GRESHAM and CONQUEST
COMMUNICATIONS GROUP, LLC                                                        PLAINTIFFS

v.                                        No. 4:16CV00241 JLH

LESLIE RUTLEDGE, in her official capacity
as Attorney General of the State of Arkansas                                        DEFENDANT

**OPINION AND ORDER**

Victor Gresham and Conquest Communications Group, LLC, bring this action pursuant to 42 U.S.C. § 1983 against Leslie Rutledge in her official capacity as Attorney General of the State of Arkansas, challenging Ark. Code Ann. § 5-63-204(a)(1) on First Amendment grounds: Count I alleges that the statute is unconstitutional on its face and as applied because it is a content-based restriction on speech that cannot withstand strict scrutiny, while Count II alleges that the statute is unconstitutional on its face and as applied because it is an impermissible prior restraint on constitutionally-protected speech. The plaintiffs moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a)(1), and the Court scheduled a hearing for June 23, 2016. The parties then moved pursuant to Federal Rule of Civil Procedure 65(a)(2) to consolidate the preliminary injunction hearing with the trial on the merits, and the Court granted the motion. At the hearing, however, neither party presented evidence, only argument, albeit argument that included factual assertions. The Court then left the record open so that evidence could be presented in support of the factual assertions. Having reviewed the briefs, heard arguments, and examined the evidence submitted, the Court holds that the statute at issue is a content-based regulation that does not survive strict scrutiny.

Gresham is a political consultant involved with the management of Conquest. Conquest engages in political communications, including communications through automated telephone calls,

on behalf of clients. Gresham previously has performed such services for political candidates in Arkansas and plans to do so in the future. Gresham seeks to conduct automated telephone calls in the state, including surveys, messages concerning voting, express advocacy calls, and a variety of other calls made in connection with political campaigns. To engage in these activities, the plaintiffs use an automated dialing system and pre-recorded messages. The plaintiffs allege that they have been chilled and restrained from performing services for political clients in Arkansas because of the following provision of the Arkansas Code:

> It is unlawful for any person to use a telephone for the purpose of offering any goods or services for sale, or for conveying information regarding any goods or services for the purpose of soliciting the sale or purchase of the goods of services, or for soliciting information, gathering data, or for any other purpose in connection with a political campaign when the use involves an automated system for the selection and dialing of telephone numbers and the playing of recorded messages when a message is completed to the call number.[1]

Ark. Code Ann. § 5-63-204(a)(1). The Arkansas General Assembly enacted this statute in 1981. A violation is a Class B misdemeanor. Ark. Code Ann. § 5-63-204(b). The Attorney General, a prosecuting attorney, and any law enforcement officer, or any telephone company serving an area from which automated telephone calls are made, may seek injunctive relief to enforce the statute, with the prevailing party entitled to attorney's fees and court costs. Ark. Code Ann. § 5-63-204(c).

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. 1. Prior to the enactment of the Fourteenth Amendment, the

---

[1] The portion of this statute relating to goods and services does not apply to the plaintiffs, and they do not challenge it. The only portion of the statute at issue here is the portion relating to political campaigns.

First Amendment did not apply to the states. *See Permoli v. City of New Orleans*, 44 U.S. 589, 11 L. Ed. 739 (1845). More than half a century after enactment of the Fourteenth Amendment, the Supreme Court held that "the concept of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech." *Fromberg v. California*, 283 U.S. 359, 368, 51 S. Ct. 532, 535, 75 L. Ed. 1117 (1931). *See also Cantwell v. State of Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed 1213 (1940) ("[t]he fundamental concept of liberty embodied in [the Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment."). As a result of the incorporation of the First Amendment into the Fourteenth, making it applicable to the states, the right to free speech has been held to apply in some way to schools,[2] prisons,[3] zoning ordinances,[4] state regulation of lawyer advertising,[5] state laws regarding defamation,[6] obscenity laws,[7] and to other governmental entities and in other circumstances too numerous to recount. Whether or not the First Amendment in its original context could function as an absolute prohibition ("Congress shall make no law . . . abridging the freedom of speech"), when incorporated into the Fourteenth Amendment and applied to the states, such an absolute prohibition is not feasible.[8] A school, for

---

[2] *Tinker v. Des Moines Ind. Com. Sch. Dist.*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 1731 (1969).

[3] *Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989).

[4] *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S. Ct. 2176, 68 L. Ed. 2d 671 (1981).

[5] *Bates v. State Bar of Ariz.*, 433 U.S. 350, 97 S. Ct. 2691, 53 L. Ed. 2d 810 (1977).

[6] *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

[7] *Smith v. California*, 361 U.S. 147, 80 S. Ct. 215, 4 L. Ed. 2d 205 (1959).

[8] Smolla opines that "absolutism is fundamentally too simplistic a method of analysis to be a viable method for handling modern First Amendment conflicts." RODNEY A. SMOLLA, 1 SMOLLA AND NIMMER ON FREEDOM OF SPEECH § 2.50 (3d ed. 1996). This comment suggests that absolutism

example, could not function without the ability to impose some restrictions on speech. Or, as a different example, "[w]hile signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police power. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S. Ct. 2038, 2041, 129 L. Ed. 2d 36 (1994).

In the absence of a constitutional provision that enunciates principles by which courts can, in these myriad circumstances, ascertain which governmental restrictions violate the right to free speech and which do not, the courts have developed "tests" for distinguishing which governmental restrictions on speech pass constitutional muster, with the Supreme Court, of course, having the ultimate say.[9] As the case law has developed, different restrictions on speech are scrutinized under different standards, depending on the type of speech restricted, where that speech falls within "the scale of First Amendment values," the type of restriction, or the reasons for the restriction.[10] *See, e.g., Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S. Ct. 1912, 1918, 56 L. Ed. 2d 444 (1978) ("we . . . have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression."). When a court

---

might not have been too simplistic for handling pre-modern First Amendment issues, but the treatise does not explain what has changed.

[9] *Cf. Konigsberg v. State Bar of California*, 366 U.S. 36, 64, 81 S. Ct. 997, 1014, 6 L. Ed. 2d 105 (1961), Black, J. dissenting (advocating "rejecting all such 'tests' and enforcing the First Amendment according to its terms.").

[10] "[M]odern First Amendment jurisprudence contains a plethora of doctrinal formulas[.]" RODNEY A. SMOLLA, 1 SMOLLA AND NIMMER ON FREEDOM OF SPEECH § 2.50 (3d ed. 1996).

4

says that a restriction on speech violates the First Amendment, it usually means that the restriction fails one of these judicially created "tests." According to David Strauss, "the text and original understandings of the First Amendment are essentially irrelevant to the American system of freedom of expression as it exists today." DAVID A. STRAUSS, THE LIVING CONSTITUTION (Oxford U. Press: 2010) at 55.[11]

The statute at issue here is a restriction on political speech which, "is, and has always been, at the core of the protection afforded by the First Amendment." *281 Care Comm. v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014). The parties agree that the statute is a content-based restriction on speech, which means that it is subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015)[12]; *see also R.A.V. v. St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542, 120 L. Ed. 2d 305 (1992) ("[c]ontent-based regulations are presumptively invalid."). Determining that a restriction on speech is subject to strict scrutiny is nearly always a death knell for the restriction: "it is the rare case in which . . . a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211, 112 S. Ct. 1846, 1857, 119 L. Ed. 2d 5 (1992).[13]

Under strict scrutiny, the state bears the burden of proving that the statute's restriction on speech (1) advances a compelling state interest and (2) is narrowly tailored to serve that interest.

---

[11] Strauss argues that the untethering of large segments of constitutional jurisprudence from the text of the Constitution is a good thing; not everyone agrees. *See* ANTONIN SCALIA AND BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (Thomson/West: 2012) at 403-10.

[12] Thus, the statute at issue here differs from the statute upheld in *Van Bergen v. State of Minn.*, 59 F.3d 1541 (8th Cir. 1995), which was not a content-based restriction. *Id*. at 1550-51.

[13] "Although strict scrutiny was at a time regarded as a certain death knell for a law, described as 'strict in theory but fatal in fact,' in more modern constitutional law adjudication laws do, from time to time, survive strict scrutiny." RODNEY A. SMOLLA, 1 SMOLLA AND NIMMER ON FREEDOM OF SPEECH § 2.50 (3d ed. 1996).

*Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1665-66, 191 L. Ed. 2d 570 (2015). "In general, strict scrutiny is best described as an ends-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest." *Wersal v. Sexton*, 674 F.3d 1010, 1020 (8th Cir. 2012).

The Attorney General identifies three interests that the statute advances, two of which are privacy interests and one of which is a safety concern: (1) protection of automated phone call recipients from unwanted, intrusive speech before it is introduced into the home; (2) protection of automated phone call recipients from repeated, unwanted intrusions; and (3) preventing the seizure of phone lines, which could interfere with emergency calls being placed or received.

While declaring unconstitutional a residential picketing ordinance, the Eighth Circuit held that similar interests related to residential privacy are substantial but not compelling. *Kirkeby v. Furness*, 92 F.3d 655, 659 (8th Cir. 1996) ("Although the interest asserted by Fargo (protecting residential privacy and tranquility) is a 'substantial' one, *Frisby*, 487 U.S. at 488, 108 S. Ct. at 2504, the Supreme Court has never held that it is a compelling interest, *see Carey v. Brown*, 447 U.S. 455, 465, 100 S. Ct. 2286, 2292-93 (1980) and we do not think that it is."). Thus, according to Eighth Circuit precedent, the privacy interests that the Attorney General says that the statute advances, while "substantial," are not "compelling."

Even if those privacy interests were compelling, they would not save the statute because it is not narrowly tailored with respect to them. Likewise, even if the purported interest in public safety is compelling, the statute is not narrowly tailored to advance that interest.

"A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S. Ct. 2495, 2503, 101 L.

Ed. 2d 420 (1988) (citing *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808-10, 104 S. Ct. 2118, 2130-32, 80 L. Ed. 2d 772 (1984)). The legislation cannot be "underinclusive," meaning that it cannot leave appreciable damage to the government's purported interest unprohibited. *Reed*, 135 S. Ct. at 2232. The Fourth Circuit in *Cahaly v. Larosa* held a similar statute unconstitutional, finding that the statute was underinclusive.[14] 796 F.3d 399 (4th Cir. 2015). The statute in question there prohibited only automated calls that were "for the purpose of making an unsolicited consumer telephone call" or were "of a political nature including, but not limited to, calls relating to political campaigns." *Id*. at 402. The court, applying strict scrutiny, held that the statute was not narrowly tailored to protect the government's purported interest–to protect residential privacy and tranquility from unwanted and intrusive automated calls. *Id*. The statute restricted two types of automated calls–consumer and political–but permitted unlimited proliferation of other types, so the statute was underinclusive. *Id*.

As noted, the Attorney General asserts that the statute at issue here furthers the state's interest in residential privacy because it prevents automated dialers from forcing unsolicited communication on unsuspecting callers within the sanctity of their homes, and she insists that the statute furthers the state's interest in public safety because it prevents the "seizure of phone lines." The latter argument relies on a United States House of Representatives report from 1991, which found that "[o]nce a phone connection is made, automatic dialing systems can 'seize' a recipient's telephone line and not release it until the prerecorded message is played, even when the called party

---

[14] The Fourth Circuit also found that plausible less restrictive alternatives existed and that the statute was overinclusive. *Id*. at 406. The court pointed out that "[c]omplaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations," yet the statute targeted political calls. *Id*. Here, the statute targets commercial calls and calls made in connection with a political campaign, but not charitable calls, debt collection calls, or political calls outside of the campaign context.

hangs up. This capability makes these systems not only intrusive, but, in an emergency, potentially dangerous as well."[15] Document #14 at 11 (quoting H.R. REP. NO. 102-317, at 10 (1991)). The Attorney General fails to explain why automated calls other than commercial calls and those made in connection with political campaigns–for example, calls encouraging individuals to contact a member of Congress regarding a bill or to attend a townhall meeting regarding a public issue–using automated dialing systems do not trample upon the state's interests in residential privacy and public safety.[16] Rather, the Attorney General asserts that "Gresham and Conquest have not demonstrated that calls from charitable organization constitute the bulk of the problem." Document #14 at 16. That argument misses the mark because strict scrutiny places no burden on the challenger to show that other, unrestricted types of speech content are more detrimental to the state's interest than the speech content that the government chose to restrict. "When the government restricts speech, the government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816, 120 S. Ct. 1878, 1888, 146 L. Ed. 2d 865 (2000).

---

[15] Apart from the question of whether technological advances since 1991 have rendered this concern obsolete, this finding merely shows that when a line is seized there is a risk that an emergency call may be impeded. No evidence has been presented here to show that automated telephone solicitations have prevented emergency calls from being placed or received, nor that there is any meaningful risk of that happening.

[16] The Attorney General relies on *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, to argue that a distinction between two types of speech is constitutional when the distinction is "related" to the government's stated interest (citing 323 F.3d 649 (8th Cir. 2003)). In *Nixon*, however, the Eighth Circuit applied a different, less demanding level of scrutiny–the *Central Hudson* test–to evaluate the regulation of commercial speech. *Id*. at 653. Here, Arkansas has regulated not only commercial speech, but political speech, and it has regulated that speech based on its content. Furthermore, the *Central Hudson* test requires only that the regulation in question "directly advance" the governmental interest asserted. The application of strict scrutiny requires that the regulation in question not only advance the governmental interest asserted, but be the least restrictive alternative available to directly advance that interest.

The Attorney General has submitted evidence that her office has received no complaints about charity robocalls and an insignificant number of complaints about debt collection robocalls. Such complaints are scarce, according to the Attorney General, in part because other statutes govern charitable organizations and debt collectors and in part because robocalling is an ineffective method to collect donations and debt.

Yet, the Attorney General fails to explain or show why other speech compromising the interests of residential privacy and public safety is left unrestricted. Unlike the statute at issue in *Cahaly*, which applied to calls "of a political nature including, but not limited to, calls relating to political campaigns," the statute here does not restrict political calls unless they are connected to a political campaign. If the interests of privacy and safety warrant restriction of automated calls made for a commercial purpose or in connection with a political campaign, they also warrant restriction of other types of automated calls. The statute is underinclusive. Banning calls made through an automated telephone system in connection with a political campaign cannot be justified by saying that the ban is needed to residential privacy and public safety when no limit is placed on other types of political calls that also may intrude on residential privacy or seize telephone lines. *See 281 Care Comm.,* 766 F.3d at 787.

The Attorney General has also failed to show that the statute is the least restrictive alternative to achieve the state's interests in residential privacy and public safety. "When a plausible, less restrictive alternative is offered to a content-based speech restriction it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy Entm't Grp.*, 529 U.S. at 816, 120 S. Ct. at 1888. The Fourth Circuit identified several less restrictive alternatives to South Carolina's content-based restriction on automated telephone calls in *Cahaly*,

9

including time-of-day-limitations and do-not-call lists. 796 F.3d at 405. Moreover, the plaintiffs have submitted to the Court a list of statutes, codes, and regulations that other states and the District of Columbia have implemented to regulate robocalls. Mechanisms used to temper the negative effects of robocalling include time-of-day restrictions,[17] disconnection requirements,[18] and prohibitions on calls to emergency lines.[19] None of these restrictions and requirements impose a categorical ban on robocalls made in connection with political campaigns. The Attorney General focuses on the implausibility of three alternatives: (1) caller I.D. laws; (2) internal do-not-call lists; and (3) an external do-not-call list, but she does not address the other alternatives and therefore fails

---

[17] The plaintiffs submit that time-of-day-restrictions–for example, only permitting calls between 9 a.m. and 9 p.m.–would serve the State's interest in residential privacy. *See* ALA. ADMIN. CODE r. 770-X-5-.17(1)(b) (2016); CAL. PUB. UTIL. CODE § 2872 (c) (West 2016); GA. CODE ANN. § 46-5-23(a)(2)(B) (West 2016); IDAHO ADMIN. CODE r. 31.51.02.102 (2016); 815 ILL. COMP. STAT. ANN. 305/15(a) (West 2016); IND. CODE ANN. 24-5-14-8(b) (West 2016); LA. REV. STAT. ANN. § 45:811(2) (2016); ME. REV. STAT. ANN. tit. 10, § 1498.3 (2016); MINN. STAT. ANN. § 325E.30 (West 2016); MISS. CODE ANN. § 77-3-453(3) (West 2016); OR. REV. STAT. ANN. § 646A.372(5) (West 2016); 52 PA. CODE § 63.60(b)(2)(iv) (2016); TENN. CODE ANN. § 47-18-1502(a)(2) (2016); TEX. UTIL. CODE ANN. § 55.125(a) (West 2015); UTAH CODE ANN. § 13-25a-103(3) (West 2016); WASH. ADMIN. CODE § 480-120-253(5)(c) (2016).

[18] The plaintiffs submit that a requirement that the automated telephone dialing system be disconnected within a certain number of seconds of the call's termination would serve the State's public safety interest. *See* ALA. ADMIN. CODE r. 770-X-5-.17(1)(d) (2016); D.C. CODE § 34-1701(b)(3) (2016); GA. CODE ANN. § 46-5-23(a)(2)(F) (West 2016); 815 ILL. COMP. STAT. ANN. § 305/15(b) (West 2016); IND. CODE ANN. § 24-5-14-6 (West 2016): IOWA CODE ANN. § 476.57(3) (West 2016); KY. REV. STAT. ANN. § 367.461(2)(c) (West 2016); LA. REV. STAT. ANN. § 45:811(6) (2016); ME. REV. STAT. ANN. tit. 10, § 1498.3 (2016); OR. REV. STAT. ANN. § 646A.372(1)(a)(A) (West 2016); 52 PA. CODE § 63.60(b)(2)(i) (2016); TENN. CODE ANN. § 47-18-1502(a)(6) (2016); TEX. UTIL. CODE ANN. § 55.126 (West 2015); UTAH CODE ANN. § 13-25a-103(5)(e) (West 2016); VA. CODE ANN. § 59.1-518.3 (West 2016); WASH. ADMIN. CODE § 480-120-253(5)(b) (2016).

[19] The plaintiffs submit that a prohibition on calls to emergency lines would serve the State's public safety interest. *See* GA. CODE ANN. § 46-5-23(a)(2)(H) (West 2016); 52 PA. CODE § 63.60(b)(2)(iii) (2016); KY. REV. STAT. ANN. § 367.461(2)(d) (West 2016); LA. REV. STAT. ANN. § 45:811(6) (2016); OR. REV. STAT. ANN. § 646A.372(2) (West 2016); TENN. CODE ANN. § 47-18-1502(a)(8) (2016); 16 TEX. ADMIN. CODE § 26.125(c)(8) (West 2016); WASH. ADMIN. CODE § 480-120-253(5)(c) (2016).

to demonstrate that no less restrictive alternative is available. She also enumerates other ways in which the plaintiffs can engage in political speech on behalf of their clients, but the cases do not say that a speech restriction can survive strict scrutiny if other means of communication are available to the speaker; if that were the law, the restrictions on speech that survive strict scrutiny would not be rare.

## CONCLUSION

According to the United States Supreme Court, a state-imposed, content-based restriction on speech can be enforced only if it passes the strict scrutiny test, and it is a rare case that survives strict scrutiny. The statute at issue here imposes a content-based restriction on speech; it is not one of the rare cases that survives strict scrutiny. The state has failed to prove that the statute at issue advances a compelling state interest and is narrowly tailored to serve that interest. A decree will be entered separately enjoining Leslie Rutledge, in her official capacity as Attorney General of the State of Arkansas, from enforcing Ark. Code Ann. § 5-63-204(a)(1) insofar as that provision applies to telephone calls made in connection with a political campaign.[20]

IT IS SO ORDERED this 27th day of July, 2016.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

---

[20] The complaint also sought monetary damages. Because the plaintiffs sued Leslie Rutledge only in her official capacity, the suit is in effect one against the state, which is immune from claims for damages by virtue of the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169-70, 105 S. Ct. 3099, 3107, 87 L. Ed. 2d 114 (1985). The plaintiffs' claims for monetary damages are therefore dismissed.